IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| HIGH SIERRA HIKERS ASSN. et al., | ) | CV F 05-0496 AWI DLB |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM OPINION |
| | ) | AND ORDER GRANTING IN |
| v. | ) | PART AND DENYING IN |
| | ) | PART PLAINTIFF'S MOTION |
| UNITED STATES FOREST SERVICE, | ) | FOR SUMMARY JUDGMENT |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| CALIFORNIA DEPARTMENT OF FISH | ) | Document # 93 |
| AND GAME, CALIFORNIA TROUT, | ) | |
| INC., BACK COUNTRY HORSEMEN | ) | |
| OF CALIFORNIA, INC., MID VALLEY | ) | |
| UNIT, KENNEDY MEADOWS | ) | |
| RESORT AND PACK STATION, INC., | ) | |
| JAMES L. PHELAN, | ) | |
| | ) | |
| Defendant Interveners, | ) | |
| | ) | |

## INTRODUCTION

This is an action for declaratory and injunctive relief by plaintiffs High Sierra Hikers Association and Wilderness Watch (collectively "Plaintiffs") against defendant United States Forest Service, and two individual Forest Service officials ("Defendants") and intervener-defendants, California Trout, Inc., Tuolumne County Sportsmen, Kennedy Meadows Resort, James Phelan, and the California Department of Fish and Game (collectively, "Interveners"). The action is pursuant to the Wilderness Act, 16 U.S.C., §§ 1131, *et seq*., and the National

Environmental Policy Act ("NEPA"), 42 U.S.C., §§ 4321 *et seq*.  The action challenges a decision by Defendants to repair and maintain and operate certain small water impoundment structures located in the Emigrant Wilderness Area.  In the instant motion, Plaintiffs seek summary judgment of their claims that Defendants' actions were contrary to law and for injunctive relief to prohibit the maintenance or repair of any dam structures in the Emigrant Wilderness.  Defendants and Interveners counter-move for summary judgment on all Plaintiffs' claims.  Federal subject matter jurisdiction exists pursuant to 28 U.S.C., § 1331.  Venue is proper in this court.

**PROCEDURAL HISTORY**

This case was transferred from the Northern District of California on April 14, 2005. Apparently, the operative pleading in the case at the time of transfer was the first amended complaint.  On September 12, 2005, Plaintiffs moved to amend/correct the complaint.  That motion was granted in part on October 24, 2005, and the currently-operative Second Amended Complaint ("SAC") was filed on October 28, 2005.  Plaintiffs moved for summary judgment on November 11, 2005.  Interveners filed an opposition on December 19, 2005, which Defendants joined on December 22, 2005.  Defendants filed their opposition to Plaintiffs' motion for summary judgment and cross-motion for summary judgment on December 22, 2005.  Interveners joined Defendants opposition and cross-motion for summary judgment on January 3, 2006. Plaintiffs filed their reply on January 20, 2006, and filed a motion to strike certain extra-record materials on January 23, 2006.  Defendants/Interveners filed their opposition to the motion to strike on January 25, 2005, and Plaintiffs filed their reply on February 2, 2006.

Hearing on the parties' motions and cross-motions for summary judgment was held on March 24, 2006.  At the hearing the parties requested leave to file additional briefing regarding congressional intent.  Leave was granted.  Plaintiffs filed a supplemental brief on March 27, 2006; Defendants filed a response to the supplemental brief on March 30, 2006; and Intervener-Defendants filed a supplemental brief on March 28, 2006.

**FACTUAL BACKGROUND/UNDISPUTED FACTS**

Plaintiffs and Defendants have filed statements of undisputed facts as to their respective motions for summary judgment, and filed objections to the factual aversions of the opposing parties. The facts set forth below represent a synthesis of the facts submitted by the parties. Disputed facts are noted and factual disputes are resolved to the extent possible.

Although neither party offers undisputed facts to explain the why the controversy is before the court at this time, it is helpful, as an initial matter, to briefly address the history and nature of the controversy. The introductory portion of the Draft EIS summarizes the historical antecedents of the current controversy.

Following designation of the Emigrant Wilderness in 1975, a document titled the "Emigrant Wilderness Management Plan" was prepared in 1976, which contained a requirement for a study to determine ". . . the condition, value and cost-effectiveness of the various [water control structures] as well as their effects on the natural hydrological processes." AR at 3460. The water control structures had been built beginning in the 1920's to develop a local fishery that had begun during the 1890's when the natural lakes in the area were planted with trout by cattlemen who use the meadows in the area for grazing. The dams, which had been constructed mostly of mortar and local stone were operated on a shared basis by the Forest Service, California Department of Fish and Game ("CDFG"), sportsmen's groups, and others. Since 1988, operation of the stream flow releases has been done primarily by CDFG. Fisheries in the Emigrant Wilderness are co-managed through a local Memorandum of Understanding ("MOU"). Controversy over the status of the dams in the Emigrant Wilderness "resulted in recent Congressional consideration of legislation related to the Emigrant dams. No specific legislation has been enacted." "The Forest Service has conducted several planning efforts related to the disposition of the dams since designation of the Emigrant Wilderness. Public and legislative requests have been received to maintain, repair and operate twelve of the dams. No maintenance has occurred since 1989 due to appeal decisions on previous planning efforts." AR at 3460.

The following facts have been compiled from the statements of undisputed facts submitted by both parties. The facts are not disputed unless otherwise noted.

On January 3, 1975, Public Law 93-632 (Section 2(b)) designated 106,988 acres as Emigrant Wilderness, and on September 28, 1984, Public Law 98-425 designated an additional 6,100 acres as part of the Emigrant Wilderness.  The Emigrant Wilderness is a glaciated area of high mountain peaks, granite domes, glacial valleys, and alpine and subalpine meadows interspersed with patches of subalpine coniferous forest.  The elevation of the Emigrant Wilderness ranges from 4,700 feet to 11,700 feet at Leavitt Peak.  The Emigrant Wilderness contains over 100 named lakes and over 500 small, unnamed lakes.  At the time the Emigrant Wilderness was designated, 18 dams existed within it; a fact that was known to Congress at the time of the designation.

The parties differ as to the status and characterization of the fish populations in the Emigrant Wilderness.  Plaintiffs aver, and Defendants do not dispute, that the high mountain lakes of the Emigrant Wilderness were originally without any native fish population.  Plaintiffs characterize the lakes of the region as having been stocked with "non-native" trout, beginning in the 1890's.  Defendants state, and Plaintiffs do not dispute, that 77 of the 100 named lakes in the Emigrant Wilderness have historically been stocked with fish.  Defendants point out the fish that were stocked were Rainbow Trout, a species that is native to both the Stanislaus and Tuolumne river systems.  The waterways of the Emigrant Wilderness drain into the Stanislaus and Tuolumne rivers.  Defendants contend, and Plaintiffs do not dispute, that the trout populations that have been established in those areas of the Emigrant Wilderness that were historically stocked are at least partially self-reproducing and that current fish stocking operations are for the purpose of enhancing populations for the benefit of anglers.

The parties agree that, of the 18 dams in the Emigrant Wilderness, 15 are associated with lakes, and except for Y-Meadow, impound water on naturally existing lakes.  All the dams are constructed of local stone and mortar, except for one dam which is earthen.  The dams are of three functional types.  Twelve of the dams are streamflow augmentation dams that are intended to increase downstream flow during dry weather in late summer or early fall.  These dams raise the height of natural lakes from about 6 to 10 feet.  Three of the dams are lake level dams that

add approximately three feet of height to existing natural lakes, but do not regulate downstream flows.  Three dams are meadow enhancement dams that are not associated with lakes.  These dams are located in stream channels and serve to raise water tables to sub-irrigate meadows.

The parties do not generally dispute the foregoing except that Plaintiffs characterize the lakes whose natural levels are raised by dams as "reservoirs."  Defendants consistently oppose this characterization, contending the impoundments do not meet the dictionary definition as they do not impound water for irrigation, domestic, industrial or other human use.  Plaintiffs also aver the meadow enhancement dams originally served to sub-irrigate meadows for the benefit of livestock.

Plaintiffs allege a number of undisputed facts that relate to the decline in importance of the dam structures in the Emigrant Wilderness since the 1950's.  Defendants have disputed the proffered facts, but the disputations pertain mostly to the appropriateness of individual descriptive words, rather than the overall facts themselves.  An examination of the Draft Environmental Impact Statement ("Draft EIS") supports the following factual allegations:  The dam system in what would eventually be incorporated in the Emigrant Wilderness began in the 1920's for the purpose of increasing the area's trout population and to "provide downstream benefits to fish habitat, food production, and power production outside the Emigrant."  Draft EIS at 3536.  Local stockmen, who had been planting trout in the Emigrant since the turn of the century noticed increased numbers of fish during wet years.  They developed the system of dams to enhance stream flows during dry years and to thereby improve the population of trout.

In 1957 the Cherry Lake Dam, which lies outside the Emigrant Wilderness, was completed; thereby flooding Cherry Valley and creating the 268,000 acre-foot Cherry Lake Reservoir.  As a result of the construction of the Cherry Lake reservoir, the importance of the system of dams in the Emigrant Wilderness diminished in terms of their importance to flood control and power production.  In addition, the Draft IES states that the role of the dams in supporting a fishery diminished with the advent of aerial stocking of fish in remote areas.

The Draft IES states the dams in the Emigrant Wilderness continue to augment stream

flows during the dry season, but that augmented stream flows are probably not necessary to maintain natural fish reproduction.  The Draft EIS points to fish populations which have been sustained in Yosemite National Park, an area similar to the Emigrant Wilderness, even though the stocking of trout in Yosemite National Park has been phased out over the last 25 years.  The parties do not dispute that the dam structures in the Emigrant Wilderness have deteriorated to varying degrees since they were originally constructed.  It is also not disputed that those dams structures that were built to manipulate streamflow have not been operated for that purpose for roughly 13 years.

The Draft EIS gives particular attention to the effects of the various proposed actions on two amphibian species, the Mountain Yellow-legged Frog ("MYLF") and the Yosemite Toad ("YT"). Both species are classified as "sensitive" under the Endangered Species Act, meaning there has been significant decline in population in the past and/or significant reduction of species distribution.  For purposes of this case it is sufficient to briefly note only the potential effects of proposed action and the no action option on these species.   The parties disagree in their respective characterizations of the effects of the proposed and alternative actions with respect to these species.  The Draft EIS supports the following conclusions:  See AR at 3714-3715 and 3718-3719.

The MYLF is rarely far from water and depends on deep pond water for escape from predators and for overwintering habitat.  The Draft EIS notes a reciprocal relationship between trout populations, which feed on the MYLF, and MYLF populations.  Based on the Draft EIS it is difficult to draw a clear conclusion that one option or the other clearly favors or disfavors MYLF populations.  MYLF populations may be benefitted under the preferred option by the maintenance of the dams because access to deep water would be maintained.  On the other hand, enhanced trout populations resulting from fisheries enhancements may increase predation on the MYLF.  Thus the no-action option may benefit the MYLF to the extent trout populations decline.  The Draft EIS points out CDFG oversees trout stocking activities and consequently populations of trout are more dependant on CDFG actions than on Forest Service actions. Additionally, there

6

is some small probability that MYLF habitats could be disturbed by repair and maintenance operations.

With respect to YT populations, there is evidence in the Draft EIS to support the contention that the species would be relatively more benefitted by the no-action option than by the preferred option.  The YT inhabits primarily wet meadows and seasonal ponds.  AR at 4147.  The no-action option would gradually reduce lake volumes as the dams deteriorated thereby potentially increasing meadow habitat for the YT.  AR at 3719.  The Final EIS notes that the no-action option may reduce YT habitat to the extent non-maintenance of the meadow maintenance dams may result in loss of wet meadow area.  Because the YT does not inhabit deep water, it is less susceptible to predation by trout.

Defendant Forest Service prepared a Final EIS  for the Emigrant Wilderness dam project.  The Final EIS incorporated the facts set forth in the Draft EIS with a few corrections that are not important here.  In the Final EIS the Forest Service considered 11 alternatives.  Of those 11 alternatives, three were considered in detail.  Plaintiffs' objection to the word "considered" on the ground it represents a legal conclusion, rather than fact, is noted and rejected.  In the Record of Decision ("ROD") for the Emigrant Wilderness Dams Final EIS, the Forest Supervisor decided that 11 of the existing 18 dams within the Emigrant Wilderness would be maintained.  The Forest Supervisor determined that these eleven structures are the minimum necessary for administration of the wilderness for reasons that include the following: (a) seven of the maintained dams are eligible for the Historic Register, and they protect and preserve historic values for future interpretative, educational and scientific benefits; (b) the other four maintained dams improve natural reproduction capabilities within existing fisheries which is beneficial for wilderness as it reduces impacts on natural processes and supports the reduction or elimination of the need by CDFG for fish stocking in these lakes; and (c) the dams are a highly valued cultural connection in the local history.  Plaintiffs disputations as to the correctness of the characterizations and conclusions reflected in the Final EIS are noted.

Plaintiffs allege the dam structures in the Emigrant Wilderness are "non-conforming"

under the Wilderness Act.  To support the proffered fact, Plaintiffs cite the introduction to the Draft EIS, which contains a single sentence referencing "non-conforming structures."  In its entirety, the sentence states: "Congress, which often includes what the disposition of non-conforming structures and uses should be [in a wilderness area], did not address the Emigrant Wilderness dams in either act."  AR at 3459.  Defendants contend the statement is misleading and point out that the Forest Service's ROD found that the eleven dams for which ongoing maintenance is proposed are compatible with the Wilderness Act and necessary for the minimum requirements for the wilderness' administration.  This proffered fact lies close to the heart of Plaintiffs' argument for summary judgment.  How the court should regard the eleven dam structures *vis-a-vis* the Wilderness Act is a subject that will be taken up in the discussion that follows.

Defendants allege the Forest Supervisor's decision, as reflected in the ROD, does not authorize the reconstruction of any dam within the Emigrant Wilderness.  Plaintiffs' dispute this proffered fact on the ground the term "reconstruction" is a legal and not factual term.  Plaintiffs consistently refer to the proposed actions pertaining to the dams as "reconstruction."  Defendants consistently object to the use of that term and insist the actions proposed in the ROD are maintenance, repair and operations.  Regardless of any ambiguity between the terms "reconstruct," "repair" and "maintain," Forest Service has defined the terms it uses for purposes of its planning documents.

The ROD defines the term  "maintain" to include "routine activities such as log removal, mortar replacement and rock replacement."  The term "repair" is defined as "activities necessary to restore the structure to its original full functioning condition, such as valve replacement and slide-gate replacement."  AR at 4193.  The Final EIS states that, pursuant to the Forest Service Manual, "Only the Chief [of the Forest Service] may authorize reconstruction of water developments within [the] designated wilderness."  AR at 4144, 4192.  The Final EIS also states that the activities proposed do not include the reconstruction of the Cow Meadow Dam, because such reconstruction cannot be authorized by the Forest Supervisor.  Elsewhere, the ROD states

1   the Cow Meadow Dam was destroyed by storms in the late 1990's and the existing lake is at its

2   natural level.  Thus, by implication, the term "reconstruction" as used in the Draft and Final EIS

3   and in the ROD means to replace that which once existed but no longer exists.  In other words to

4   make operable a structure that repair would not be sufficient to make operable.  The court finds

5   the documents cited by Defendants support their allegation the ROD does not authorize

6   reconstruction of any dam structures as that term is defined by the ROD and by the Final EIS.

7        Of the eleven dams that have been selected for repair, maintenance and/or operation by

8   the ROD, ten are streamflow augmentation dams that were constructed predominantly in the

9   1920s and 1930s and up to the early 1950s.  All these dams were built primarily by a person

10  named Fred Leighton, who, Defendants allege, made significant contributions to streamflow

11  maintenance dams and fisheries improvements in California.  Seven of the eleven dams

12  (Bigelow, Emigrant, Emigrant Meadow, Leighton, Long, Lower Buck, and Red Can) qualify as

13  historic properties under the National Historic Preservation Act (NHPA) and are eligible for

14  listing on the National Register of Historic Places ("Historic Register").  Structures that are

15  included in the Historic Register must meet at least one of four possible criteria and must retain

16  their integrity.  Forest Service determined that the seven dams listed above met two of the four

17  criteria: (1) they "are associated with events that have made a significant contribution to the

18  broad patterns of our history;" and, (2) they "are associated with the lives of persons significant

19  in our past."  AR at 2679.

20       The parties agree that defendant Forest Service applied the criteria for inclusion in the

21  National Register and came to the conclusion the seven above-named dams met the criteria.  The

22  parties also do not dispute that the California State Office of Historic Preservation of the

23  California Department of Parks and Recreation concurred in the Forest Service's determination.

24  Plaintiffs contend the dams should not be listed because they hinder, rather than enhance the

25  wilderness, and that regardless of the criteria employed the continuing existence of the dam

26  structures is in conflict with the Wilderness Act.  For a more extensive discussion of the

27  historical context of the Emigrant Wilderness dams, and the application of Historical Register

28                                          9

1   criteria to the issue of their eligibility for inclusion in the Register, see pages 2656 to 2685 of the

2   Administrative Record.[1]

3       In 1988, the Forest Service issued an Environmental Assessment and Decision Notice

4   under NEPA determining that one more of the dam structures is eligible for listing NHPA, and

5   deciding to maintain/repair[2] twelve of the eighteen dam structures.  That decision was appealed.

6   On appeal, the Regional Forester reversed the decision and ordered all of the dam structures to be

7   removed.  Subsequently, the Regional Forester reversed that decision, allowing the Forest

8   Supervisor to determine if new information related to the dam structures was available.  In 1991,

9   the Forest Service issued a Land Resource Management Plan for the Stanislaus National Forest,

10  Which directed that a management plan for the Emigrant Wilderness be written within two years.

11      In 1998, the Forest Service issued an EIS and ROD to adopt "Emigrant Wilderness

12  Management Direction" that stated that the Forest Service could rebuild eight of the dam

13  structures, in order to maintain streamflows.  In 1999, the Regional Forester reversed the Forest

14  Supervisor's decision, stating that adequate documentation did not exist to explain why each dam

15  structure might be necessary to meet minimum requirements for administering the wilderness.

16  Since the 1999 decision, no specific plan or disposition exists for the dam structures.

17      In 1995, the Forest Service and CDFG entered into a Memorandum of Understanding

18  ("MOU") related in part to managing fish and wildlife in certain wilderness areas.  The MOU

19  states that removal of existing water-related improvements is among the activities that require

20  joint decisions by the two agencies.  In 2000, the Forest Service and CDFG adopted a "Joint

21  Strategy" for future management of these specific dam structures.  Plaintiffs characterize the

22

23          [1]     A number of individual alleged undisputed facts proffered by Defendants are
24  omitted because they are redundant or not relevant to the determination of the issue before the
    court.

25          [2]     Plaintiffs' characterize the activities authorized by the Forest Service's decision as
26  "rebuilding."  Defendants do not dispute the fact generally, but elsewhere have characterized the
    activities authorized as "repair, maintain and operate," but not "rebuild."  Pursuant to the
27  foregoing discussion the court uses the words "repair/maintain" in place of Plaintiffs' preferred
    terminology as that use is consistent with the definitions of terms as contained in the AR.

28

1  Joint Strategy as being based on an agreed-upon rationale of streamflow maintenance.

2  Defendants dispute this characterization and contend the Joint Strategy "was a cooperative

3  framework that left the agencies to each make an independent final decision based upon a site

4  specific analysis."  The Draft EIS supports Defendants' characterization of the Joint Strategy.

5  AR at 3490-91.  After review of the Joint Strategy, the court concludes it reflects a rationale to

6  support fishery maintenance or enhancement, along with a commitment to further monitor to

7  determine whether actions are necessary to benefit fairy shrimp and yellow-legged frogs.

8        In 2002, the Forest Service began preparing the EIS at issue in this case.  In 2003, the

9  Forest Service issued a draft EIS stating that "[m]aintenance of water impoundment structures

10  will be consistent with the USDA Forest Service/[CDFG] Joint Strategy."  The draft EIS includes

11  a proposed action to repair/maintain/operate[3] twelve of the eighteen dam structures in the

12  Emigrant Wilderness.  The Draft EIS analyzed two other alternatives: letting all of the structures

13  naturally deteriorate (the "do nothing alternative"), and a "heritage" alternative, which would

14  have maintained the seven dam structures eligible for listing under the NHPA.  The Final EIS,

15  issued in December 2003 corrected a few portions of the Draft EIS and otherwise adopted the

16  Draft EIS as final.  The ROD, which was also issued in December 2003, modified the action

17  proposed in the Final EIS slightly by authorizing action on eleven, rather than twelve of the

18  dams.

19        Plaintiffs allege a number of additional undisputed facts, most of which pertain to alleged

20  beneficial effects of the operation of streamflow dams on trout populations, and negative effects

21  on populations of the mountain yellow-legged frog and the Yosemite toad, and negative effects

22  on riparian habitats generally.  Generally, Defendants aver the evidence cited in the

23  administrative record does not support Plaintiff's contentions or that Plaintiff's contentions are

24  misleading.  Specific contentions with respect to environmental effects will be discussed and

25

26        [3]    Again, the word chosen by Plaintiffs is "rebuild," which is not used here because
   the actions contemplated by the Draft EIS and Final EIS do not include rebuilding as Defendants
27  define that term.

28

resolved, if and when they may be germane to the issues being discussed.

**LEGAL STANDARD**

Summary judgment is appropriate when it is demonstrated that there exists no genuine

issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Poller v.

Columbia Broadcast System, 368 U.S. 464, 467 (1962); Jung v. FMC Corp., 755 F.2d 708, 710

(9th Cir. 1985); Loehr v. Ventura County Community College Dist., 743 F.2d 1310, 1313 (9th

Cir. 1984).

> Under summary judgment practice, the moving party always bears the initial
> responsibility of informing the district court of the basis for its motion, and
> identifying those portions of "the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any," which
> it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party has the burden of

proof at trial, that party must carry its initial burden at summary judgment by presenting evidence

affirmatively showing, for all essential elements of its case, that no reasonable jury could find for

the non-moving party.  United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th

Cir.1991) (en banc); Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986); see also

E.E.O.C. v. Union Independiente De La Autoridad De Acueductos Y Alcantarillados De Puerto

Rico, 279 F.3d 49, 55 (1st Cir. 2002) (stating that if "party moving for summary judgment bears

the burden of proof on an issue, he cannot prevail unless the evidence that he provides on that

issue is conclusive.")

If the moving party meets its initial responsibility, the burden then shifts to the opposing

party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities

Serv. Co., 391 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280

(9th Cir. 1979).  In attempting to establish the existence of this factual dispute, the opposing

party may not rely upon the mere allegations or denials of its pleadings, but is required to tender

evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 477 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

**DISCUSSION**

**I.      Standard of Review of Agency Actions**

Defendants correctly contend that, because neither the Wilderness Act or NEPA create a private right of action, judicial review of agency action is governed by Administrative Procedures Act ("APA").  Pursuant to the provisions of the APA as codified at 5 U.S.C. § 706, an agency action may only be set aside if it is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' [Citation.]" Wilderness Soc'y v. United States Fish & Wildlife Serv., 316 F.3d 913, 921 (9th Cir. 2003).

The parties disagree as to the amount of deference that should be accorded to Forest Service in making its decisions.  The analytical framework employed in assessing the deference due agency decisions in the context of the Wilderness Act is well established:

> In Wilderness Society v. United States Fish & Wildlife Service, our en banc panel addressed the question of the level of deference due to the Forest Service when it makes decisions implementing the Wilderness Act. 353 F.3d 1051, 1059-60 (9th Cir. 2003) (en banc).  We apply the framework articulated in that case to determine what level of deference to apply to the facts at hand.  If the statute is clear and unambiguous, no deference is required and the plain meaning of Congress will be enforced.  Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842-43[. . .] (1984); Wilderness Soc'y, 353 F.3d at 1061.  If the statute is ambiguous, the agency's decision is entitled to Chevron deference if it has the force of law.  United States v. Mead Corp., 533 U.S. 218 [. . .] (2001).  If the decision does not have the force of law, it is reviewed with "respect" according to the factors set out in Mead and Skidmore v. Swift & Co., 323 U.S. 134, 140 [. . .] (1944); Wilderness Soc'y, 353 F.3d at 1067.

1  High Sierra Hikers Ass'n v. Blackwell, 390 F.3d 630, 638-639 (9th Cir. 2004).

2      Following Wilderness Society[4], the court begins by asking whether the dam improvement

3  project "offends the plain meaning and manifest congressional intent of the Wilderness Act."

4  353 F.3d at 1060.  Under Chevron, the inquiry is "'whether Congress has directly spoken to the

5  precise question at issue.'"   Id. (quoting Chevron, 467 U.S. at 842).

6      ***A. Applying Chevron***

7      The first task in the application of the Chevron analysis is to enlist the "[c]anons of

8  statutory construction [to] help give meaning to [the] statute's words."  Wilderness Society, 353

9  F.3d at 1060.  It is important to note that, following Wilderness Society, the inquiry is not

10  exhaustive.  Rather, the question is, did Congress speak to the issue *directly*?  Id.  By definition,

11  this analysis includes only what can be discerned by examination of the text of the statute itself;

12  and specifically excludes any resort to non-statutory materials.  See Bedroc, LLC v. United

13  States, 541 U.S. 176, 183 (2004) ("our inquiry begins with the statutory text, and ends there as

14  well if the text is unambiguous."); United States v. McNeil, 362 F.3d 570, 574 (9th Cir. 2004)

15  ("resort to legislative history is justified only where the 'face of the act is inescapably

16  ambiguous.").  Thus, where the issue is whether Congress has spoken to the issue at hand directly

17

18      [4]    Wilderness Society v. United States Fish and Wildlife Service consists of two
19  decisions. The first, located at 316 F.3d 913, (hereinafter "Wilderness Society (Alaska)")was
   decided by a three-judge panel on January 13, 2003.  The second, located at 353 F.3d 1051
20  ("Wilderness Society"), was submitted to an *en banc* panel on September 16, 2003, and decided
   on December 30, 2003.  The cases differ markedly as to the analytical frameworks used to
21  determine the amount of deference due to the agency, the conclusion reached regarding
   deference, and the final determination of the case.  In Wilderness Society (Alaska), the court
22  began the analysis by determining whether the agency's determination carried the force of law as
   described in Mead.  Applying Mead, the Wilderness Society (Alaska), court determined the
23  agency's actions were due highest deference under Chevron, and that the agency's actions were
   reasonable and therefore lawful.  See Wilderness Society (Alaska), 316 F.3d at 921-925.  In
24  contrast, the *en banc* panel in Wilderness Society began its analysis under Chevron's first step,
   which is the determination of whether the agency action offends manifest congressional intent.
25  The Wilderness Society court, focusing on the commercial nature of the project, found the
   project incompatible with Congress's intent and therefore due no deference under Chevron.
26  Wilderness Society, 353 F.3d at 1062.  Under this analysis, the Wilderness Society court held the
   project violates the Wilderness Act.  Id. at 1067.  The difference in outcomes of the two analyses
27  underscores the importance of the analytical approach.  Wilderness Society represent the now-
   authoritative approach in the Ninth Circuit as recognized by Blackwell, 390 F.3d at 638-639.

28                                         14

and unambiguously, the court may not, as a matter of logic, be guided by evidence of legislative history since to do so the court would be required to resolve the question of whether Congress has spoken directly in the negative.

The *en banc* court in <u>Wilderness Society</u> set forth the interpretive canons relevant to this enquiry:

> We begin with the language of the statute.  [Citation.]  Another fundamental canon of construction provides that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.  [Citations.]  ¶ It is also "a fundamental canon that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  [Citations.]  If necessary to discern Congress's intent, we may read statutory terms in light of the purpose of the statute.  Thus the structure and purpose of a statute may also provide guidance in determining the plain meaning of its provisions.  [Citation.]

<u>Wilderness Society</u>, 353 F.3d at 1060-1061 (internal citations and quotations omitted).

Plaintiffs claim that Forest Service's decision to repair/maintain/operate eleven of the eighteen dams in the wilderness violates the categorical prohibition against structures contained in the Wilderness Act.  Pertinent to the issues presented in this motion, the Wilderness Act declares the purposes of land designated as wilderness area and limits permissible activities on designated lands.  These purposes and limitations are set forth in 16 U.S.C. § 1133 as follows in pertinent part:

**(b) Agency responsibility for preservation and administration to preserve wilderness character; public purposes of wilderness areas**

> Except as otherwise provided in this chapter, each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character.  Except as otherwise provided in this chapter, wilderness areas shall be devoted to the public purposes of recreational, scientific, educational, conservation, and historical use.

**(c) Prohibition provisions: commercial enterprise, permanent or temporary roads, mechanical transports, and structures or installations; exceptions: area administration and personal health and safety emergencies**

> Except as specifically provided for in this chapter, and subject to existing private rights, there shall be no commercial enterprise and no permanent road within any wilderness area designated by this chapter and, except as necessary to meet minimum

requirements for the administration of the area for the purpose of this chapter (including measures required in emergencies involving the health and safety of persons within the area), there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area.

The parties agree that dams are "structures" or "installations" within the meaning of the Wilderness Act. The question the court must first answer is therefore whether dams are the sort of "structures" or "installations" the maintenance and operation of which would offend Congress's intent when it declared that designated wilderness areas would have "no structure or installation within any such area."

Congress may speak to an issue of permissible uses in an area designated as wilderness by specifying those uses at the time the area is designated. The parties agree that Congress made no mention in the legislation that created the Emigrant Wilderness of any dams or water impoundment structures.

Congress may also speak to the precise question at issue within the statute itself. Congress at least touched on the issue of dams and reservoirs in wilderness areas by providing, pursuant to 16 U.S.C. § 1133(d)(4) that the President may authorize certain water development projects within wilderness areas for the public good. Neither party contends section 1133(d)(4) is at play in this case. Aside from the provisions of section 1133(d)(4), the text of the Wilderness Act provides no indication that Congress intended to exempt existing dams in wilderness areas from the general prohibition against "structures" or "installations." The court must conclude the plain and unambiguous text of the Wilderness Act speaks directly to the activity at issue in this case – repairing, maintaining and operating dam "structures" – and prohibits that activity.

In addition, the overall language of subdivision (d) of section 1133, along with case authority and Forest Service Policy, imply that "when there is a conflict between maintaining the primitive character of the area and between any other use [. . .] the general policy of maintaining the primitive character of the area must be supreme." Minnesota Pub. Interest Research Group v. Butz, 401 F.Supp. 1276, 1331 (D.Minn. 1975) (overruled on other grounds in Minnesota Pub. Interest Research Group v. Butz, 541 F.2d 1292 (8th Cir. 1975); see also 23 U.S.C. § 1133(d);

16

AR at 2076 ("Where there are alternatives among management decisions, wilderness values shall dominate over all other considerations except where limited by the Wilderness Act, subsequent legislation, or regulations"); 36 C.F.R. § 293.2(c) ("wilderness values will be dominant to the extent not limited by the Wilderness Act").

Based on the foregoing, the court concludes the proposed actions in this case – the repair, maintenance and operation of the dam structures – are clearly and unambiguously contrary to the provisions of the Wilderness Act.  Consequently, Forest Service's determination to undertake those actions is not due deference under Chevron.[5]

### B. Deference Due to Forest Service's Technical Determinations

Having determined, as this court has, that Chevron deference is not due with respect to the agency's determination of the ultimate issue that is the subject of challenge, the court follows Wilderness Society, where the court looked to the Supreme Court's decisions in Mead and Skidmore to determine what deference the court was to accord the agency's non-legal determinations.  The Wilderness Society court summarized the standard for determining deference as follows:

> Under Mead and Skidmore, the weight that we are to give an administrative interpretation not intended by an agency to carry the general force of law is a function of that interpretation's thoroughness, rational validity, and consistency with prior and subsequent pronouncements.  Skidmore, 323 U.S. at 140 [. . . .]  Mead adds as other relevant factors the "logic[ ] and expertness" of an agency decision, the care used in reaching the decision, as well as the formality of the process used.  Mead, 533 U.S. at 235.

---

[5]    The court has focused its analysis of deference due on the question of whether the *effect* of the proposed action – in this case the repair, maintenance or operation of the dams – is congruent with the purposes of the Wilderness Act.  The court recognizes that Defendants have implied that the court's analysis should start with an analysis of the deference due Forest Service's underlying rationale for the proposes action.  In this case, Defendants suggest the court's analysis should start with a determination of the deference due Forest Service's determination that the maintenance, repair, or operation of the dam structures is "necessary to meet minimum requirements for the administration of the area for the purpose of this chapter."  While the court believes the analysis presented above is most in accord with Wilderness Society and High Sierra Hikers Ass'n, the court is aware those cases could be read to direct district courts to start with an analysis on the agency's underlying rationale, rather than with the effect of the proposed action.  In the interests of a more complete discussion, the analysis of the deference due Forest Service's rationale is presented below as an alternative analysis following the court's main analysis.

Wilderness Society, 353 F.3d at 1068.

Applying the factors in Mead and Skidmore to the present case, it is clear that the determinations by Forest Service that are technical or categorical in nature are due great deference.  Therefore the Forest Service's observations and conclusions concerning the conditions of the dams, the effect of operation of the dams on various species, the effect of operation of the dams on riparian habitats, and the status of the dams *vis-a-vis* their historical designations or qualifications are due great deference.

**II.  Agency Actions Under the Wilderness Act**

The parties agree that Forest Service's determination that the repair, maintenance and operation of the dams in the Emigrant Wilderness is lawful under the Wilderness Act is based on the agency's determination that those actions are "necessary to meet minimum requirements for the administration of the area for the purpose of this chapter."  Following the analysis in Wilderness Society, the court, having determined that Forest Service's decision to repair, maintain and operate the dams is not entitled to deference under Chevron, reviews de novo whether the actions authorized by the ROD are, in fact, "necessary to meet the minimum requirements."

Because the court defers to Forest Service's technical observations and conclusions, the Forest Service's conclusion that operation of the streamflow dams will enhance trout populations is accepted as fact.  The court further gives deference to Forest Service's categorization of certain of the dam structures as qualifying for inclusion in the Historical Register, and to Forest Service's conclusion that maintenance and repair of those dams will preserve their historical value.  The question for the court is whether the Forest Service plan of repair, maintenance and operation of the streamflow dams is "necessary to meet minimum requirements for the administration of the area for the purpose of this chapter."

Not surprisingly, case authority directly or indirectly addressing the issue of repair, maintenance or operation of stream flow dams in wilderness is sparse.  Pertinent to the issue of whether a fishery enhancement project in a wilderness area is compatible with the Wilderness

18

Act, the Wilderness Society court observed:

> We thus deal with an activity with a benign aim to enhance the catch of fishermen, with little visible detriment to wilderness, under the cooperative banner of a non-profit trade association and state regulators.  Surely this fish-stocking program, whose antecedents were a state run research project, is nothing like building a McDonald's restaurant or a Wal-Mart store on the shores of Tustumena Lake.  Nor is it like conducting a commercial fishing operation within designated wilderness, which we have previously proscribed. [Citation.] Nor is the project like cutting timber, extracting minerals, or otherwise exploiting wilderness resources in a way that is plainly destructive of their preservation.  ¶ Conversely, the challenged activities do not appear to be aimed at furthering the goals of the Wilderness Act.  The project is not aimed at preserving a threatened salmon run.  Looked at most favorably for the proponents of the fish-stocking project, it might be concluded that the project only negligibly alters the wild character of Tustumena Lake and is not incompatible with refuge values, though those issues are disputed.

Wilderness Society, 353 F.3d at 1062-1063 (footnotes and internal citations omitted).

Ultimately, the decision in Wilderness Society was pegged to the court's determination that the fish-stocking activity was commercial.  However, the scope of facts considered by the Wilderness Society court is instructive in the present case.  Significantly, the Wilderness Society court recognized that the fish-stocking operation, in and of itself, was not an activity that furthered the goals of the Wilderness Act because the activity was not aimed at preservation of the activities of established populations of fish that were later threatened.  The situation in the instant case is analogous.  What the planned action seeks to accomplish in this case is to regulate flows in streams whose flows were not historically regulated for the purpose of enhancing a population of fish that did not historically exist and whose continuing existence is not dependent on the repair, maintenance or operation of the dam structures.

While the outcome of the case in Wilderness Society turned ultimately on the commercial nature of the fish-stocking operation, the present case turns on man-made structures whose presence in a wilderness area are no less at odds with the textual provisions of the Wilderness Act.  Forest Service's own information acknowledges that the operation of the stream flow dams alters the dynamic of populations of fish and amphibians.  While Forest Service casts the changes brought about by the dams as achieving a balance of sorts between amphibians and fish; the fact remains that the balance is being struck between the historically established amphibious species,

1  whose habitat is diminished in the balance, and the historically absent fish species, whose

2  presence is the result of relatively recent human endeavor.

3      While fishing is an activity that is common among visitors to wilderness areas, neither

4  fishing nor any other particular activity is endorsed by the Wilderness Act, nor is the

5  enhancement of any particular recreational potential a necessary duty of wilderness area

6  management.  Rather, the Wilderness Act seeks to "secure for the American people of present

7  and future generations the benefits of an enduring resource of wilderness."  23 U.S.C. § 1131(a).

8  The wilderness that the Act seeks to preserve is not defined by reference to any particular

9  recreational opportunity or potential utility, but rather by reference to the land's status or

10  condition as being "Federal land retaining its primeval character and influence, without

11  permanent improvements or human habitation [. . . .]" § 1131(c).

12      Because it is not possible to infer from this language that establishment (much less

13  enhancement) of opportunities for a particular form of human recreation is the purpose of the

14  Wilderness Act, it is not possible to conclude that enhancement of fisheries is an activity that is

15  "necessary to meet minimum requirements for the administration of the area for the purpose of

16  this chapter."

17      Defendants have argued that Wilderness Society can be distinguished from the present

18  case on the basis of the nature of the activity being challenged.  In Wilderness Society, the

19  activity in question was of a commercial nature.  Wilderness Society, 353 F.3d at 1062.  The fact

20  the challenged activity in Wilderness Society was of a commercial nature is a distinction without

21  a difference.  Both "commercial enterprises" and "structures" are prohibited by the same

22  sentence within the Wilderness Act and the only distinction between the two is that "structures"

23  may be maintained to the extent they may be "necessary to meet minimum requirements for the

24  administration of the area."  The court does not find, and the parties present no argument, that the

25  existence of that exception implies that a structure offends the Wilderness Act any less than a

26  commercial enterprise where that exception clause is not applicable.

27      The Wilderness Act presents no textual basis for the proposition that the prohibition

28                                      20

against "structures or installations," of which the dams in this case are an example, is somehow less compelling than the prohibition against "commercial activity."  Indeed, if one considers the overall legislative intent of the Wilderness Act to preserve "area[s] where the earth and its community of live are untrammeled by man," 16 U.S.C. § 1131(c), one must conclude that the sort of commercial activity that was found offensive to the Wilderness Act in Wilderness Society is no more offensive, and perhaps less so, than the activity proposed in the present case.  In Wilderness Society, the activity at issue was "an activity with a benign aim to enhance the catch of fishermen, with little visible detriment to wilderness . . . ."  Wilderness Society, 353 F.3d at 1062.  In the instant case, the proposed activity creates permanent structures that alter the hydrological scheme of the area and alter the natural distribution of species and habitats.

When the court applies the analytical process in Wilderness Society that resulted in the prohibited of a relatively benign commercial enterprise in the wilderness area in that case, the court can find no distinction that would justify a different decision in this case.  Lacking a textual reason to hold that a commercial enterprise, no matter how benign, is more compellingly or categorically prohibited than the Wilderness Act's prohibition against "structures", the court must presume the same categorical prohibition that applied in Wilderness Society against commercial enterprises must also apply here against the "structures" that are at issue in this case.

There is a similar paucity of authority with respect to the repair, maintenance, or operation of "structures" within wilderness areas on the basis of their status as being eligible for or entered into the National Register of Historic Places.  In Wilderness Watch v. Mainella, 375 F.3d 1085 (11th Cir. 2004) ("Mainella"), the court examined the effect of the Wilderness Act on the obligations of the Park Service to maintain certain historical structures and an associated access road located in a designated wilderness area on Cumberland Island.  Id. at 1091.  In Mainella the Eleventh Circuit addressed primarily the use of motorized public access to certain historical structures in and adjacent to the wilderness area, and secondarily the duty of the agency to preserve the historical structures within.  With respect to the historical structures, the Mainella court observed:

> . . . [16 U.S.C.] Section 1133(b) mentions "historical use" along with "recreational, scenic, scientific, educational, [and] conservation" uses.  However, this list tracks the definition of wilderness areas in § 1131(c), which describes "a primitive and unconfined type of recreation" and "ecological, geological, or other features of scientific, educational, scenic, or historical value."  16 U.S.C. § 1131(c).  Given the consistent evocation of "untrammeled" and "natural" areas, the previous pairing of "historical" with "ecological" and "geological" features, and the explicit prohibition on structures, the only reasonable reading of "historical use" in the Wilderness Act refers to natural, rather than man-made, features.

Id. at 1092.  The court went on to observe that "Congress wrote the wilderness rules and may create exceptions as it sees fit.  Absent these explicit statutory instructions, however, the need to preserve historical structures may not be inferred from the Wilderness Act nor grafted onto its general purpose."  Id.

The only other case cited by any party having directly to do with the maintenance of historical structures in wilderness areas is Olympic Park Associates v. Mainella, 2005 WL 1871114 (D.Wash. 2005) ("Olympic Park").  In Olympic Park, the court considered whether the repair and maintenance of  wilderness shelters, which were eligible for inclusion in the National Historical Register, was "necessary to meet minimum requirements for the administration of the area for the purpose of this chapter."   The Olympic Park court noted that Congress did not specifically provide for the repair, maintenance or continued presence of the shelters and therefore that the Park Service's proposed actions were based on the exemption provision of 16 U.S.C. § 1133(c).

The Olympic Park court found persuasive the Ninth Circuit's decision in Wilderness Society, which took a restrictive view of the exception language.  Olympic Park, 2005 WL 1871114 at *6.  The Olympic Park court examined the conflict between the Wilderness Act's purpose of preserving wilderness values with both the historic or safety-related purposes of the exception language of section 1133(c).  The court determined that, to the extent the Wilderness Act seeks to preserve historical values, the reference is to the historical values of the natural environment, not to the structures placed there by man.  Olympic Park, 2005 WL 1871114 at *6. The Olympic Park court also held that agency actions necessary to meet "requirements for the

22

administration of the area for the purpose of this chapter (including measures required in emergencies involving the health and safety of persons within the area)," does not justify the maintenance or repair of wilderness shelters where it is evident from the language of the Wilderness Act that it is an integral part of the wilderness experience that visitors to the wilderness area "meet nature on its own terms." Id.

Thus, such authority or case law as exists indicates that where courts have considered the issue of whether man-made structures may be maintained in a wilderness area under either the general exception clause or for the purpose of preservation of historical values, the preservation of wilderness values had been predominant. See Mainella, 2005 WL 1871114 at *8 (designation under Wilderness Act is a specific provision which takes precedence over status under the NHPA, which is a general provision). As Plaintiffs point out, the dams in question, while perhaps exemplars of the contributions of a particular historical individual to small-dam construction, are not unique. Absent a declaration by Congress of the need to restore and preserve the dam structures in recognition of their historical significance, there is nothing the court can point to that would authorize such an action where the maintenance of the dams would otherwise come into conflict with the Wilderness Act.

Further, courts have construed the phrase "necessary to meet the minimum requirements for administration of the area" narrowly. The analysis in Olympic Park indicates how "necessity" in this context has been interpreted in the strict sense of "that which much be by the nature of things: that cannot be otherwise by reason of inherent qualities: [. . .] that is determined and fixed and inevitable." Webster's Third New Int'l Dictionary, 1510 (1993). In Olympic Park, even the utility of the shelters as a safety feature for visitors who might find themselves unprepared in the face of harsh weather was not sufficient to justify the repair or replacement of the shelters. The Olympic Park court held that the phrase "necessary to meet minimum requirements for the administration of the area for the purpose of this chapter (including measures required in emergencies involving the health and safety of persons within the area)," 16 U.S.C. § 1133(c), "most logically refers to matters of urgent necessity rather than to conveniences for use in an

1 emergency." Olympic Park, 205 WL 1871114 at *4.  Thus, even safety considerations will

2 authorize only those actions that are strictly and immediately necessary and are not sufficient to

3 authorize the repair of structures where some other administrative approach not involving

4 structures would suffice.

5      Although Olympic Park is merely persuasive and not binding on this court, the

6 application of the principles in Wilderness Society by the Olympic Park court to the issue of

7 historical structures is highly relevant to the instant case.  Defendants attempt to distinguish the

8 case at hand from Olympic Park by pointing out that in Olympic Park the structures were to be

9 removed, completely rebuilt and replaced.  To the extent Defendants are trying to build a

10 distinction based on rebuilding rather than maintaining or repairing, the difference is more one of

11 semantics than substance.  It is not the activity itself that is at issue, it is the object of the activity.

12 Here, as in Olympic Park, the object of the activity is to perpetuate the existence of structures in a

13 designated wilderness area.  The rationale set forth in Olympic Park that produced the conclusion

14 that the repair and replacement of the structures was not permissible under the Wilderness Act is

15 equally applicable in the instant case.

16      Here, there is no logical necessity in maintaining, repairing, or operating the dams in

17 order to administer the area for purposes of the Wilderness Act.  The area manifested its

18 wilderness characteristics before the dams were in place and would lose nothing in the way of

19 wilderness values were the dams not present.  What would be lost is some enhancement of a

20 particular use of the area (fishing), but that use, while perhaps popular, is not an integral part of

21 the wilderness nature of that area.

22      Defendants also attempt to differentiate the present case with that of Mainella by pointing

23 out the agency involved in that case (and in Olympic Park) was the National Park Service

24 ("NPS") rather than the Forest Service.  Although Defendants contend the NPS administers parks

25 for purposes "different than the Forest Service multiple use objectives," they offer no authority

26 for the implied contention that application of the Wilderness Act should yield different results

27 under similar factual circumstances where the objectives of the administrating agency are

28 24

1  different.  The court can find nothing in the Wilderness Act that supports that contention and is

2  aware of no case authority to that effect.

3        Defendants also contend Mainella can be differentiated factually because the structures at

4  issue there were historical houses or structures associated with a historical settlement on the

5  island.  See Mainella, 375 F.3d at 1088-1089 and n.3 (describing the Plum Orchard, a mansion

6  complex located just outside the wilderness area, and the Settlement, an area occupied by freed

7  slaves after the Civil War).  Defendants draw a distinction between the settlement structures in

8  Mainella, and the dams in the instant case which, Defendants contend, are small, low, and

9  visually integrated into the natural surroundings.  Again, the court is unaware of, and Defendants

10  do not cite, any textual basis for making that type of distinction, nor is it clear how such a

11  distinction would or could be pertinent if the issue is the preservation of historical structures in a

12  wilderness area.  Distinctions such as unobtrusive and harmonious with the natural environment

13  involve subjective judgments that may vary depending on the interests of the observer.  The

14  Wilderness Act's prohibition against structures is categorical so far as the court can determine,

15  allowing only those exceptions that are specifically set forth in the Act or in Congress's

16  designation of a particular wilderness area, neither of which apply here.

17        In sum, Defendants' basic argument with regard to the Wilderness Act centers around the

18  level of deference owed to Forest Service with regard to its findings and conclusions.  The flaw

19  in Defendants' argument is that, regardless of how carefully and thoroughly Forest Service

20  considered the various action plans, the plans considered and the plan finally chosen are

21  predicated on the legal contention that maintenance, repair and operation of the dams is

22  "necessary to meet minimum requirements for the administration of the area for purposes of this

23  chapter" – a contention that is without legal or logical support.  While Forest Service's factual

24  findings are due considerable deference under Skidmore, the legal foundations of Forest

25  Service's actions are due no deference because the proposed actions are contrary to the express

26  purposes of the Wilderness Act, and are in the nature of permitting and do not carry the force or

27  effect of legal determinations.  See Wilderness Society, 353 F.3d at 1059-160 (discussing factors

28

governing deference under <u>Chevron</u>, <u>Mead</u>, and <u>Skidmore</u>).  The legal basis for Forest Service's preferred plan is without support and runs afoul of the Wilderness Act because the actions contemplated are not "necessary to meet minimum requirements for the administration of the area" in conformity with 16 U.S.C. § 1133(c).

### B.  Interveners' Contentions

Interveners filed an "Amended Notice of Opposition," which the court refers to as "interveners' opposition" hereinafter.  Interveners' opposition contains a number of grounds not mentioned in Defendants opposition and therefore separate consideration of those arguments is appropriate.

Interveners' first contention is summarized completely by the heading given to the argument – "The Wilderness Act Is Not A Purist Manifesto."  The gist of this argument is that the Wilderness act does not favor any particular viewpoint of wilderness.  Interveners examine the text of the Wilderness Act and seek by way of argument to blunt the effect of certain words like "untrammeled" by urging the court to interpret their meaning in a more moderate way so as to conclude the Wilderness Act, while prohibiting overt development, does not prohibit "improvements" for the benefit of human enjoyment of the area.  The conclusion Interveners promote is that dams of the sort found in the Emigrant Wilderness are not prohibited by the Wilderness Act; or, in the alternative, the Wilderness Act does not impose an affirmative duty on the Forest Service to remove the dams.

This section of Interveners opposition is remarkable in that it comprises seven pages of argument without a single citation to legal authority, except for the excerpts from the Wilderness Act, which Interveners seek to define to their advantage.  Interveners point to environmental benefit, or non-detriment, and argue at some length that maintaining and operating the dams as streamflow regulation would have a beneficial impact on fish populations at minimal ecological cost to the Emigrant Wilderness as a whole.

Interveners' arguments are, at least to some extent, self-defeating.  First, subjective characterizations aside, the Wilderness Act is as close to an outcome-oriented piece of

26

environmental legislation as exists.  Unlike NEPA, or the Clean Air or Clean Water Acts, the Wilderness Act emphasizes outcome (wilderness preservation) over procedure.  As such, it is as close to a "purist manifesto" as may be found in the area of environmental law.  Interveners comments relative to whether the Wilderness Act is or is not a purist manifesto miss the necessary legal points: whether the repair, operation or maintenance of man-made water impoundment structures are non-conforming under the Wilderness Act, and, if so, whether the repair, maintenance or operation of the dams is otherwise authorized by the exception language because of the historical status of the structures or because of the necessity of the dams in the administration of the wilderness area.

Interveners point out that while there are about 100 named lakes in the Emigrant Basin and about 85 of those are stocked with trout, only 15 lakes are implicated by Forest Service's plan.  Further, Interveners correctly point out only a small percentage of the riparian habitat in the wilderness is affected by the dam structures.  From these facts, Interveners contend there is little ecological prejudice (or burden) from repairing, maintaining or operating the dam structures.

Using the same facts, one can conclude there is little prejudice to interveners or fishermen generally if the dam structures are not maintained and are allowed to deteriorate naturally.  As Plaintiffs point out, there are a number of other lakes in the Emigrant Wilderness, and Forest Service's own research leads to the conclusion that the introduced trout populations in the lakes are probably self-sustaining.  Thus, to the extent some comparison of ecological burdens is appropriate, Interveners own contentions, as well as Defendants' determinations regarding both the effect of the dams on the local environment and the Emigrant Wilderness as a whole, fail to show that the ecological burdens of non-operation, non-repair and non-maintenance of the dams are more onerous than the ecological burdens of operation, repair and maintenance.

Interveners next attempt to differentiate High Sierra Hikers Ass'n from the present case on factual grounds.  To the extent Interveners' argument has merit, it applies, if at all, to the discussion pertaining to Plaintiff's allegation that Forest Service's plan was adopted in violation of NEPA.  Interveners' arguments will be addressed *infra* to the extent they are relevant.

27

Next, Interveners contend Plaintiff's arguments based on the Wilderness Act fail to take into account the exceptions contained in 16U.S.C. § 1133(d) that preserve existing state water rights and state rights to manage and regulate wildlife and fisheries.  Section 1133(d) of Title 16 provides, in pertinent part:

> (6) Nothing in this chapter shall constitute and express or implied claim or denial on the part of the Federal Government as to exemption from State water laws.

> (7) Nothing in this chapter shall be construed as affecting the jurisdiction or responsibilities of the several States with respect to the wildlife and fish in the national forests.

Interveners contend that federal jurisdiction within the Emigrant Wilderness is "subordinate to the state's sovereign interest in the fish and waters affected by this case." Interveners' opp. at 17:3-4.  Interveners further assert "California has a direct legal interest in the fish as well as in the navigable waters of the lakes impounded by the dams.  The state may lawfully assert a right to sustain the fishery and to maintenance of the dams in issue that is unimpaired by the Wilderness Act."  Interveners' opp. at 6-9.  Interveners cite NRDC v. Houston, 146 F.3d 1118, 1131-1132 (9th Cir. 1998); NRDC v. Patterson, 333 F.Supp.2d 906, 917 (E.D. Cal. 2004); and California Trout v. State Water Resources Control Board, 207 Cal.App.3d 585 (1989), for the proposition that an owner of a dam is required, pursuant to California Fish & Game Code, section 5937, to release sufficient water from the dam to sustain downstream fish populations.

The court has examined the cited cases and finds their applicability in the present case is problematic because none of these cases deal with the intersection of the Wilderness Act with this particular portion of the California Fish & Game Code.  It is not clear that section 5937 compels the continuing existence of a dam where the dam has no owner and no utility other than stream flow regulation.  Nor is it clear that concerns of stream flow create an obligation to repair, maintain or operate a dam where there has been no operation of the dam for purposes of stream flow enhancement for a period of many years and there is no compelling evidence of "necessity." Finally, notwithstanding the applicability of the cited authority to the present case, the fact

28

1   remains no party with standing to do so has chosen to assert state water rights.  Interveners

2   appear to recognize this and have opted to not develop this argument any further; perhaps leaving

3   it to the state to assert rights in the regulation of stream flows at some later time.

4          In their final argument with respect to Plaintiffs' claims under the Wilderness Act,

5   Interveners contend Plaintiffs cannot maintain the present suit because Forest Service's decision

6   to repair, maintain and operate the dams is not a final decision within the meaning of the APA.

7   Interveners' contentions in this regard are without merit.

8          The APA authorizes suit by "[a] person suffering legal wrong because of
           an agency action, or adversely affected or aggrieved by agency action within the
9          meaning of relevant statute." 5 U.S.C. § 702.  Where no other statute provides a
           private right of action, the "agency action" complained of must be *final* agency
10         action." § 704 (emphasis added).  "Agency action" is defined in § 551(13) to
           include "the whole or part of an agency rule, order, license, sanction, relief, or
11         equivalent or denial thereof, *or failure to act*."  (Emphasis added).

12  Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 61-62 (2004) ("SUWA").

13         The SAC seeks relief both from agency action – the decision to repair, maintain and

14  operate the dams – under 4 U.S.C. § 706(2); and for agency inaction – the failure to fully

15  consider removal of the dams – under 4 U.S.C. § 706(1).   Suits under the APA challenging both

16  agency action under section 706(2), and agency inaction under section 706(1), require that the

17  action or inaction being challenged be a "final agency action" as defined in section 551(13) of

18  Title 4.  See SUWA, 542 U.S. at 62 (action under section 706(1) demands final agency action);

19  Montana Wilderness Ass'n, Inc. v. United States Forest Service, 314 F.3d 1146, 1149 (9th Cir.

20  2003) (the challenged activities must constitute final agency action for suit under 5 U.S.C. §

21  706(2)).

22         With respect to Plaintiff's suit seeking relief pursuant to 5 U.S.C. § 706(2) for Forest

23  Service's proposed affirmative actions to repair, maintain and operate the dams, the relief

24  requested is pursuant to a final action within the meaning of section 511(13).  "Two conditions

25  must be met for agency action to be considered final under the APA. [Citation.] First 'the agency

26  action should mark the consummation of the agency's decision making process; and [second],

27  the action should be one by which rights or obligations have been determined or from which

28                                            29

legal consequences flow.' [Citation.]" <u>Montana Wilderness Ass'n</u>, 314 F.3d at 1150 (quoting <u>Ecology Ctr. Inc. v. United States Forest Serv.</u>, 192 F.3d 922, 925 (9th Cir. 1999).  Here, there is no question that Forest Service's ROD represented the culmination of the agency's decision making process.  The ROD also determined the legal obligation of Forest Service with respect to the repair, maintenance and operation of the dam structures and the rights of interested parties, including Interveners, with respect to the continuing operation of the dam structures.

Irrespective of whether the facts of the case warrant relief pursuant to either or both subsections (1) and (2) of 5 U.S.C. § 706, the jurisdictional requirement for the consideration of entitlement to either remedy on the merits is satisfied if the decision of the agency represents a final agency decision.  It is sufficient for jurisdictional purposes that Forest Service's ROD authorizing the repair, maintenance and operation of the dams is final from the standpoint of Forest Service.  That Forest Service may later act in concert  with CDFG is not pertinent to the jurisdictional question because the APA, which forms the legal basis for this action, only reaches the federal agency's decision making process and the ROD represents the final determination of the extent of action the federal agency may take.

The court notes Plaintiffs have moved to strike Interveners' opposition for untimely filing.  The court will exercise its discretion to deny the motion to strike in the interest of providing consideration to as broad a range of arguments as possible and because consideration of Interveners' opposition does not prejudice Plaintiffs.

### C.  Additional Arguments Presented at Hearing

At oral argument on March 24, 2006, Defendants asserted evidence not previously brought to the attention of the court to bolster their argument that there is evident congressional intent that supports the action plan set forth in the ROD.  Specifically, Defendants cite the comments presented at a meeting of the congressional Committee on Interior and Insular Affairs that preceded the enactment of the legislation as reported in the House Report.  The comments that were referenced at oral argument appear as follows in the House Report:

> There are 54 million board feet of commercial timber, but it has not been

counted in the allowable cut.  Four grazing allotments cover about 5900 (?) acres and this grazing shall continue.  *Water production is important and this will not be curtailed.  Certain small weirs and flow dams are present but are essentially unnoticeable.*

¶ . . . . ¶

Within the area recommended for wilderness designation, there are drift fences (5 miles) which will be *maintained*, but several cabins and barns will be *removed* within ten years.  Two snow cabins will be retained.  *The weirs and small dams will likewise be retained.*

¶ . . . . ¶

In addition, Forest Service has recommended *exclusion* of two areas.  ¶ Exclusion 1 contains [illegible number] acres.  Within it are located the Relief dam and reservoir, a dam tender's cabin and other permanent improvements and mechanical [illegible] needed for the operation of the dam and reservoir.  There is no disagreement regarding the exclusion of this area.

H.R. Rep. No. 93-989 at 9-10 (1974) (as provided in copy to the court, emphasis added).

Notwithstanding any reservations the court may have with the use of comments presented during congressional committee discussion to indicate congressional intent, the court does not agree that the comments presented above constitute proof of an intent by Congress to exempt the dams from the general rule of the Wilderness Act prohibiting structures.  Nor does it evince Congress's judgment that the repair, maintenance or operation of the dams is "necessary to meet minimum requirements for the administration of the area ."  Two lines of reasoning lead to this conclusion.

Just as the court must first examine the plain language of a statute, the court here relies on the plain language of the House Report to determine what was said, and perhaps more importantly, what was not said.  The House Report makes it abundantly clear Congress chose the verbs it applied to various aspects of the Emigrant Wilderness purposefully.  The choice of verbs in the House Report indicates that Congress intended (to the extent the comments contained in the House Report can be held to actually reflect congressional intent) that cabins would be *removed*, drift fences would be *maintained* and the weirs would be *retained*, along with some snow cabins.  To this court, the ambiguity contained in the word "retained" is purposeful.  If Congress had intended that the weirs should continue in operation for an indefinite time in the

future, the report should have specified the weirs would be *maintained* and/or *repaired*.  In the context of Congress's observation that the weirs are "essentially unnoticeable," the term "retain" is as compatible with the concept of allowing natural degradation as it is with the concept of repair and operation.  The only thing the comments definitely indicate in an intention that the weirs are not to be actively removed.

Second, the comments contained in the House Report do not establish, or even infer, any necessity for the maintenance, repair or operation of the weirs or dam structures.  Enhancement of fish populations is not mentioned, nor is preservation of historic values.  At most, the comments evince an intent that water production in the Emigrant Wilderness will not be impeded.  If anything, this comment seems to diminish the importance of the dams in the overall management of the area.  The parties do not dispute that the dams have no significant role in overall water production or flood control, since that function is filled by the Cherry Creek Reservoir.  Furthermore, the comment that the dams or weirs are "essentially unnoticeable" tends to indicate Congress recognizes the non-importance of the dams as structures affecting overall water production from the wilderness area.

The language of the Wilderness Act establishes at least the presumption that structures, including the dams here in question, are incompatible with the purposes of the Wilderness Act, and are therefore prohibited structures unless something within or without the text of the Act clearly indicates they are "necessary to meet minimum requirements for the administration of the area."  The court finds the above-noted ambiguous statements in a congressional committee hearing are not sufficient to alter the court's prior conclusion that the dams in question are not necessary to meet minimum requirements for the administration of the area.  Consequently, the court must conclude that Forest Service's determination that it is acting in conformity with the Wilderness Act by authorizing the repair, maintenance and operation of the dams is erroneous and contrary to law.

### D. Additional Briefing After Oral Argument

At oral argument on March 24, 2006, the court granted all parties the opportunity to

32

submit limited briefing on the significance of the House Report No. 93-989, which Interveners
contended was contained in the Administrative Record, but which none of the parties had
brought to the attention of the court or the other parties.  Plaintiffs filed their supplemental brief
on March 27, 2006.  Interveners filed a summary of their additional points on March 28, 2006, in
which they summarized the points of their arguments and stated an intent not to further brief the
subject unless requested.  The Federal Defendants filed their brief on March 30, 2006.  There
followed an additional round of briefs filed by Plaintiffs and Interveners, both on April 10, 2006,
and by Federal Defendants on April 11, 2006.

All the additional filings followed the arguments set out in Plaintiffs' first brief filed on
March 27.  There, Plaintiffs set forth two basic arguments.  First Plaintiffs argued that the
statutory language is not ambiguous and therefore resort to consideration of legislative history is
not appropriate.  Plaintiffs argued further that, even if resort to legislative history is warranted,
the legislative history that is available fails to resolve the ambiguity.  With respect to the latter
argument, Plaintiffs point out that the comments recorded in the House Report previously noted
are, to some extent, contradicted by comments by Sen. Cranston to the effect that improvements
noted in the Emigrant Wilderness at the time of its creation where of a nature that could be dealt
with by "time and removal."  See AR at 14.  Defendants contend this statement is not indicative
of any intent with respect to the dams, rather Defendants contend the comment had to do with
some primitive cabin structures located in the area.  Plaintiffs point to a letter written by Sen.
Cranston in 1997 in connection with legislation that was then pending sponsored by Sen.
Doolittle that would have required maintenance of the eighteen dam structures.  In the letter, Sen.
Cranston clarified the intent of the comments he made in 1974 that are recorded in the House
Report.  Sen. Cranston stated in the letter it was his intent in 1974 to state that the dam structures
would be left to deteriorate.  See AR at 698.

The parties have argued back and forth on this issue and have cited one portion or the
other of the legislative record to support the claim that the record does or does not evince an
intent to maintain, repair or operate the dam structures, or that these activities were deemed

33

1   necessary for the administration of the wilderness area.  The court has examined the portions of

2   the Administrative Record cited by the parties and has considered the arguments briefed.  The

3   court remains convinced that even if the intent of Congress as reflected in statute is ambiguous

4   and resort to legislative history is warranted, the material cited does not resolve the ambiguity.

5           The court's reasoning pertaining to the issues raised by the parties in the additional

6   briefing has been covered for the most part in prior discussion.  Only a brief summary will be

7   repeated here.  First, the court has examined the statute and the case law interpreting it and finds

8   the general prohibition of structures is not ambiguous.  Second, the review of the materials

9   reflecting the legislative history of the Emigrant Wilderness indicates Congress is fully capable

10  of carving out exceptions at the time of designation, if that is its intent, and of differentiating

11  between maintenance, repair and simple retention of structures.  It is also capable of eliciting

12  comments as to the necessity of structures that are to be excepted from the general prohibition

13  against structures and is capable of making that necessity explicit.  Third, the court has examined

14  the proffered evidence of congressional intent and finds no specific intent with respect to the dam

15  structures is manifest.

16          As previously discussed, courts only look to congressional intent when examination of

17  statutory text fails to resolve the issue.  A court examining legislative history for evidence of

18  intent must find that intent is manifest or else the examination is just a matter of substituting one

19  ambiguity for another.  Particularly in cases such as the one at bar where congressional intent is

20  being proffered to rebut a presumption established by statute, congressional intent must be plain

21  or it is absent.  If Congress intended that the maintenance, repair or operation of the dam

22  structures is  "necessary to meet minimum requirements for the administration of the area," then

23  the court must assume Congress would have made a clear and unequivocal statement to that

24  effect.  Such is not the case here.  The court concludes the proffered evidence of legislative intent

25  fails to establish that congress intended to declare the dam structures conforming with the aims

26  of the Wilderness Act or to otherwise permit their repair, maintenance or operation.

27

28                                          34

**II. Alternative Analysis**

The logical structure of the court's analysis of deference due Forest Service's decisions has been to ascertain first whether the actions authorized by Forest Service's ROD – the repair, maintenance and operation of the dams – is compatible with the purposes and terms of the Wilderness Act. The court found the proposed actions incompatible with the purposes of the Wilderness Act, and consequently the court held Forest Service's determination the proposed action was lawful was not due deference under <u>Chevron</u>. As a final step, the court reviewed de novo Forest Service's proposed action to determine whether the action is nonetheless lawful under the exception clause contained at section 1133(c) because the repair, maintenance and operation of the dams is "necessary to meet minimum requirements for the administration of the area." In making this de novo determination, the court deferred to Forest Service's technical and categorical determinations. While the court believes this is the appropriate analysis in light of <u>High Sierra Hikers Ass'n</u> and <u>Wilderness Society</u>, the court recognizes those cases could reasonably be interpreted to require that the court consider first what level of deference is due to Forest Service's determination that the repair, maintenance and operation of the dams was necessary to meet minimum requirements for the administration of the area. In the interest of a more inclusive discussion, the court undertakes this analysis below.

The exception language at 23 U.S.C. § 1133(c) permits otherwise prohibited structures "as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter." The parties do not dispute that Forest Service has specifically referenced this "exception" provision to support the actions proposed in the ROD. Because the exception language of section 1133(c) references the *necessity* of non-conforming activities or structures in the administration of the area, the focus is not so much on the non-conforming activity or structure itself as on the role that activity plays in the administration of the area.

This approach finds elaboration in <u>Wilderness Society</u> where the court, considering the question of whether the fishery enhancement project was a commercial activity prohibited by the Wilderness Act, determined that "as a general rule both the purpose and effect of challenged

activities must be carefully assessed in deciding whether a project is a 'commercial enterprise' within the wilderness that is prohibited by the Wilderness Act." 353 F.3d at 1064. Although the context here is not exactly analogous to the context in Wilderness Society, the court finds the examination of purpose and effect as necessary here as in that case and finds the discussion in Wilderness Society equally supportive of that approach in this case. See id. at 1063-1064 (discussing supporting authority for examination of "purpose and effect").

The purpose of the activity proposed by the Forest Service in the ROD is twofold; to enhance fisheries by enhancing downstream flows, and to preserve historical values. Of the two purposes, the former is predominant. Both Wilderness Society and Wilderness Society (Alaska) deal with a fishery enhancement project in a wilderness area on the Kenai Peninsula in Alaska. The enhancement project did not involve any dams or other structures, but involved the harvesting of sockeye salmon eggs at Tustumena Lake, the hatching of the eggs in a hatchery and the release of the salmon fry into the lake where they would mature prior to returning to the waters of the Cook Inlet. The project was supported by, and intended to benefit, the commercial salmon fishery in the Cook Inlet.

In Wilderness Society (Alaska), the court focused first on the question of whether the agency's decision to permit the enhancement project was equivalent to rule-making or carried the force of law within the meaning of Mead, 533 U.S. at 226-227. The court reasoned that, since the decision was issued pursuant to a congressional grant of power to manage the refuge, and was issued following notice and comment, and because the enhancement project was consistent with the final plan, which is analogous to a rule, the decision to permit was due deference under Chevron. Focusing solely on the fishery enhancement nature of the project, the Wilderness Society (Alaska) court reasoned the Wilderness Act was ambiguous as to the fishery enhancement projects because Congress had not spoken to that particular issue. The court's analysis focused on the ambiguous nature of the terms "wilderness conditions" and "natural character." Wilderness Society (Alaska), 316 F.3d at 923-924. Finding the Forest Service's decision was "reasonable," the court found the decision valid. Id. at 930.

1    In contrast, the *en banc* decision in <u>Wilderness Society</u> focused on the nature of the

2    fishery enhancement project and determined that the project's purpose and effect were

3    fundamentally commercial since the objective was to enhance the numbers salmon for the benefit

4    of the commercial salmon fishers in the Cook Inlet.  353 F.3d at 1064.  The *en banc* panel's

5    focus on the purpose and effect lead directly to the conclusion the planned enhancement project

6    offended the plain meaning and intent of the Wilderness Act and was therefore due no deference.

7    <u>Id</u>. at 1067.

8         The difference between the facts of this case and those of <u>Wilderness Society</u> is that in

9    this case there is no allegation of any commercial purpose or effect in the planned agency action.

10   The decision that remains is whether fishery enhancement, in and of itself, offends the plain

11   meaning and intent of the Wilderness Act.  The court in <u>Wilderness Society (Alaska)</u> considered

12   this question directly – albeit erroneously omitting any consideration of the commercial nature of

13   the enhancement project – and concluded that Congress had not "expressly prohibited fishery

14   enhancement within wilderness areas."  <u>Wilderness Society (Alaska)</u>, 316 F.3d at 923.  Although

15   the ultimate conclusion reached by <u>Wilderness Society (Alaska)</u> was later rejected by the *en banc*

16   panel based on its flawed analytical framework, the *en banc* panel did not correct the observation

17   in <u>Wilderness Society (Alaska)</u> that the Wilderness Act is ambiguous with respect to fishery

18   enhancement as such.  For the purposes of this discussion only, the court will assume the finding

19   by the <u>Wilderness Society (Alaska)</u> court is valid; that is, that fishery enhancement does not

20   directly offend the plain meaning and intent of the Wilderness Act.

21        The second purpose of Forest Service's proposed action – to preserve historical values –

22   requires less discussion.  The Wilderness Act, as quoted above, specifically acknowledges

23   "historical use" as one of the values the Wilderness Act seeks to promote.  Thus, while it remains

24   ambiguous whether "historical use" can justify the maintenance repair or operation of structures

25   that would otherwise be offending, at least it is clear that the purpose of the Wilderness Act is not

26   directly offended by actions that seek to preserve historical use.  Thus, at minimum, the

27   Wilderness is ambiguous with respect to the proposed preservation of dam structures on the

28

grounds of historical use.

Having found the Wilderness Act is ambiguous with respect to the Forest Service's planned actions to repair/maintain/operate the dams, the court proceeds to the next step in the analytical framework set forth in High Sierra Hikers Ass'n ; that is, whether the Forest Service's determination has the force of law.  390 F.3d at 638-639.  In Mead, the Supreme Court held that "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."  Mead, 533 U.S. at 226-227.

The Wilderness Society court considered whether, as an alternative to their holding that the project was a commercial enterprise that offended the clear intent of the Wilderness Act, the court's decision would change if the court had found the Wilderness Act was ambiguous with respect to the fishery enhancement project contemplated.  Wilderness Society 353 F.3d at 1067. The Wilderness Society court concluded the case involved only "an agency's application of law in a particular permitting context, and not an interpretation of a statute that will have the force of law generally for others in similar circumstances."  Id.  Similarly, the Mead Court concluded "classification rulings are best treated like 'interpretations contained in policy statements, agency manuals, and enforcement guidelines.' [Citation.] They are beyond the *Chevron* pale."  Mead 533 U.S. at 234; see also High Sierra Hikers Ass'n, 390 F.3d at 684 (Chevron deference not due where agency is not acting in a way that would have precedential value for subsequent parties).

The determination Forest Service made with regard to the dam structures involved the application of set criteria to the particular factual context reflected in each of the dam structures. Because each determination was dependant on an individualized set of facts, the determinations have no precedential effect outside the set of decisions that were actually made.  Following Mead, Wilderness Society, and High Sierra Hikers Ass'n, the court concludes Forest Service's determinations with regard to the compatibility of the individual dam structures in the Emigrant Wilderness with the purposes of the Wilderness Act are not due Chevron deference.  For the

1   reasons already discussed, the court determines the factual and categorical determinations by

2   Forest Service are due complete deference.

3        Using this foregoing alternative analysis, the court arrives at the same conclusion

4   concerning deference to agency decisions as stated previously; that is, the court must examine the

5   lawfulness of the actions authorized by the ROD de novo while accepting as factual the facts set

6   forth by Forest Service.  Having arrived at the same conclusion regarding deference, the

7   remainder of the court's analysis concerning agency action remains the same and the court

8   reaches the same overall conclusion.  The Forest Service's determination to repair/maintain or

9   operate the dam structures is in conflict with the purposes of the Wilderness Act and Forest

10  Service's decision as reflected in the ROD is therefore contrary to law and an abuse of discretion.

11  **III.  Plaintiffs' Claim Under NEPA**

12       Plaintiffs alleges Forest Service violated the provisions of NEPA because it failed to

13  consider a reasonable range of alternatives.  Specifically, Plaintiffs contend Forest Service did

14  not consider a course of action that would have resulted in the removal of the dams and the

15  restoration of stream beds and adjoining riparian areas to their original (pre-dam) condition.

16  Plaintiffs contend the Draft EIS and the subsequent Final EIS were prepared with the specific

17  goal in mind of facilitating the MOU between Forest Service and CDFG.  Plaintiffs contend the

18  MOU embodied a "side agreement" with CDFG that includes a joint commitment to repair,

19  maintain and operate the dams structures.  Plaintiffs contend that, as a consequence of the MOU,

20  Forest Service was prevented from giving serious consideration of other reasonable alternatives;

21  such as the removal of the dams and affirmative restoration of lake beds and stream courses.

22       As an initial matter, Defendants contend Plaintiff is barred from bringing any action on

23  grounds of NEPA violation because Plaintiffs failed to challenge Forest Service's plan on the

24  ground of NEPA violation during the comment period on the Draft EIS.  Defendants rely on

25  Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, 435 U.S. 519 (1978), and

26  Dep't of Transportaton v. Public Citizen, 541 U.S. 752 (2004), for the proposition that objection

27  to an EIS must be made to the agency during the time the EIS is under consideration so that the

28

agency has the opportunity to give adequate consideration to the objection.  Failing timely notice of objection to the agency preparing the EIS, the right to raise the objection in subsequent litigation is waived.  Public Citizen, 541 U.S. at 764.

Plaintiff cites Vermont Pub. Int. Res. Group v. United States Fish &Wildlife Ser., 247 F.Supp.2d 495, 514 (D. Vt. 2002) to support their contention that they are not barred from raising an issue that was not directly raised during the comment portion of the administrative proceeding.  A review of both the cited and related case authority indicates the issue of issue exhaustion is somewhat unsettled as yet in the Ninth Circuit.

The Supreme Court's decision in Public Citizen appears to have confronted the issue directly:

> What is not properly before us, despite respondents' argument to the contrary, [. . .] is any challenge to the EA due to its failure properly to consider possible alternatives to the proposed order [. . . .]  Persons challenging an agency's compliance with NEPA must "structure their participation so that it . . . alerts the agency to the [parties'] position and contentions," in order to allow the agency to give the issue meaningful consideration.  Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 533 [. . .](1978).  None of the respondents identified in their comments any rulemaking alternatives beyond those evaluated in the EA and none urged [Appellant] to consider alternatives.  Because respondents did not raise these particular objections to the EA, [Appellant] was not given the opportunity to examine any proposed alternatives to determine if they were reasonably available.  Respondents have therefore forfeited any objection to the EA on the ground that it failed adequately to discuss potential alternatives to the proposed action.

Public Citizen, 541 U.S. at 764.

Perhaps significantly, the case Plaintiffs rely upon, Vermont Public Interest Research Group, was decided two years before Public Citizen.  In Vermont Public Interest Research Group, the court analyzed issue exhaustion in light of the Supreme Court's decision in Sims v. Apfel, 530 U.S. 103, 107-108 (2000).  There, the Supreme Court noted that requirements of issue exhaustion are largely matters of statute, and that, in the absence of a specific statutory requirement, "a judicially imposed requirement of issue exhaustion is based on the extent to which the particular administrative proceeding is 'analog[ous] to normal adversarial litigation.' [Citation.]"  Vermont Public Interest Research Group, 247 F.Supp.2d at 515 (quoting Sims, 530

U.S. at 109).   Plaintiffs observe that in Sims, the Supreme Court noted that the requirements of issue exhaustion "are largely creatures of statute."  530 U.S. at 107-108.  Plaintiffs follow Vermont Public Interest Research Group in contending that under Sims, if administrative issue exhaustion is required under NEPA, then there should be a statutory provision so stating.  Since there is no such statute, Plaintiffs reason there is no such requirement and their claim under NEPA is not barred for failure to raise the issue during the comment period.

So far as the court can determine, Vermont Public Interest Research Group has not been widely followed.  Sierra Club v. Bosworth, 352 F.Supp.2d 909, 926 (D. Minn. 2005) is the only case that has come to this court's attention that directly follows Vermont Public Interest Research Group for the proposition that issue exhaustion is not required where a plaintiff challenges the range of alternatives addressed by an EIS.  The Ninth Circuit has not addressed the issue directly under the rubric of "issue exhaustion."  Rather the Ninth Circuit has analyzed the problem as akin to the issue of notice and waiver.  The Ninth Circuit has stated "those who challenge an EIS 'bear a responsibility to structure their participation so that it is meaningful, so that it alerts the agency to the [parties'] position and contentions.' [Citations.]" A party has participated in a sufficiently meaningful way when it has alerted the agency to its position and claims."  City of Sausalito v. O'Neill, 386 F.3d 1186, 1208 (9th Cir. 2004) (quoting City of Angoon v. Hodel, 803 F.2d 1016, 1022 (9th Cir. 1986).

In Vermont Public Interest Research Group, the court recognized that the decision in Sims arose in the context of  administrative proceedings in a social security case.  Vermont Public Interest Research Group, 247 F.Supp.2d at 515.  It appears to this court that the extent of the holding in Sims has been narrowed by Public Citizen. This court believes the Ninth Circuit's approach in City of Sausalito conforms to the holding in Public Citizen while at the same time providing a realistic means of ascertaining whether a party challenging an EIS on the ground of exclusion of a particular alternative from detailed consideration "has participated in a sufficiently meaningful way" in the administrative process.  The question thus becomes whether the challenging party has placed the agency on notice as to the specific alternative it favors.

Here, Defendants have alleged Plaintiffs did not raise the issue of removal of the dams to the Forest Service at all during the comment period.  Plaintiffs do not dispute the allegation and instead have made the foregoing argument.  Baring any further showing of notice by Plaintiffs to Forest Service, Plaintiffs' claim under NEPA should be barred under City of Sausalito.

Even if Plaintiff's claim under NEPA is not barred, the claim fails on substantive grounds.

As with claims under the Wilderness Act, judicial review of federal agency actions under NEPA are reviewed under the APA.  Olympic Park, 2005 WL 1871114 at *2.  Unlike the Wilderness Act, "NEPA does not work by mandating that agencies achieve particular substantive environmental results.  Rather, NEPA promotes its sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action."  Marsh, 490 U.S. at 360, 109 S.Ct. At 1858.  Thus, "NEPA is a procedural statute that does not 'mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions.' [Citation.]"  High Sierra Hikers Ass'n v. Blackwell, 390 F.3d 630, 639 (9th Cir. 2004).  "[S]o long as the agency has taken a 'hard look' at the environmental consequences, a reviewing court may not impose its preferred outcome on the agency."  Mainella, 375 F.3d at 1094.

 Judicial review of an agency's EIS under NEPA is extremely limited.  Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp., 222 F.3d 677, 680 (9th cir. 2000).  "The reviewing court may not substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action."  Oregon Envtl. Counsil v. Kunzman, 817 F.2d 484, 492 (9th Cir. 1987).  Although the "alternative section is 'the heart of the environmental impact statement,' 40 C.F.R. § 1502.14," Idaho Conservation League v. Mumma, 956 F.2d 1508, 1519 (9th Cir. 1992), "NEPA does not provide an agency much guidance regarding which alternatives must be considered."  Texas Comm. On Natural Res. v. Van Winkle, 197 F.Supp.2d 586, 608 (N.D. Tex. 2002).  Pertinent to the issue before the court, 40 C.F.R. § 1502.14 provides only that the agency

must:

> (a) Rigorously explore and objectively evaluate all *reasonable* alternatives, and for alternatives that were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.
>
> (b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.
>
> (c) Include reasonable alternatives not within the jurisdiction of the lead agency.
>
> (d) Include the alternative of no action.

"This circuit employs a 'rule of reason' that asks whether an EIS contains a 'reasonably thorough discussion of the significant aspects of the probable environmental consequences. [Citations.] The district court must make a 'pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation." Oregon Envt'l Council, 817 F.2d at 492.  An agency must explain the basis for each conclusion that further consideration of a suggested alternative is unwarranted, but the universe of possible alternatives "must be bounded by some notion of feasibility."  Vermont Yankee, 435 U.S. at 550-551.

Plaintiffs contend the EIS was deficient because the alternative labeled "Maximize Amphibian Habitat Benefits" was not selected for detailed study, and was not selected because the Joint Strategy memorialized in the MOU had previously committed Forest Service to the preferred option to the exclusion of all other options; in particular the Amphibian Habitat option. Defendants allege, and the record indicates, that Forest Service did, in fact, consider the option of removal of all the dams in question.  As stated in the Draft EIS:

### 2.4.1. Maximize Amphibian Habitat Benefits

An alternative was considered that did not maintain any of the dams and called for the physical removal of the dams.  The alternative was dropped because it is not consistent with the Forest Plan direction, which says, "Dams without a high enough value to warrant retention should be allowed to deteriorate naturally (no maintenance) consistent with FSM direction, rather than removed (Forest Plan Direction, 2002, p. 65)."  This alternative does not meet the need to implement the Forest Plan or move forward on the Joint Strategy.  In addition, this alternative does not address social and cultural values associated with recreational fisheries and historical resources.

1    AR at 3521 (underscore in original).

2        The Joint Strategy mentioned above refers to the agreement between the Forest Service

3    and the CDFG, as memorialized in the MOU, "to work cooperatively on site-specific analysis

4    and additional data collection for future management of the dams."  AR at 3462.  Specifically,

5    the Joint Strategy "did not make a decision to maintain or not maintain dams, but it established a

6    cooperative framework for future management decisions."  Id. (underscore in original).

7        The court cannot conclude that, as a matter of law, the EIS was deficient because it did

8    not give detailed consideration to Plaintiff's preferred alternative.  Forest Service gave bases for

9    its conclusion that the Amphibian Habitats option did not require detailed consideration and

10   those bases are reasonable, whether or not the court or the parties agree.  Forest Service also gave

11   detailed consideration to the no action option.  Further, there is no allegation that public input

12   was somehow impeded or that the examination of the options that were studied in detail was

13   somehow insufficient.  Here, the bottom line is that Plaintiffs are displeased with the choice

14   made, but do not offer sufficient grounds for the court to find that the basis upon which the

15   decision was made was deficient.

16                              **RELIEF REQUESTED**

17       Plaintiffs' SAC requests both declaratory and injunctive relief.  As to declaratory relief,

18   Plaintiffs request the court declare Defendants violated both NEPA and the Wilderness Act and

19   hold unlawful and set aside those actions authorized by the ROD pursuant to 5 U.S.C., section

20   706(2).  Pursuant to the foregoing discussion, the court will deny Plaintiffs request for relief as to

21   their claims under NEPA, and grant the requested relief as to the claim under the Wilderness Act.

22       Plaintiffs also request relief pursuant to 5 U.S.C., section 706(1) to set aside Forest

23   Service's decision to not fully consider the physical removal of the dam structures and require

24   Forest Service to fully consider that option.  The court is without authority to grant that relief.

25   Plaintiff has failed to make any showing that Forest Service is required to affirmatively remove

26   non-conforming structures.  See SUWA, 542 U.S. at 64 ("a claim under § 706(1) can proceed

27   only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is

28                                      44

*required to take*").  Indeed, such authority as the court has found, as well as indications of congressional intent as reflected in the House Report indicate there is no such obligation.  In the absence of any showing that the Wilderness Act imposes a duty to physically remove pre-existing non-conforming structures, there is no basis to compel agency action under the APA.  A challenge to the scope of options considered by Forest Service must similarly fail.  The range of options considered implicates the agency's decision making process which is subject to the terms of NEPA.  As previously discussed the court has determined there is no NEPA violation.  Consequently, there is no basis for challenge under NEPA as well.  Plaintiff's request to compel Forest Service consideration of the option of removal of the dam structures will be denied.

Plaintiffs have also requested Defendants be enjoined from any maintenance, repair or operation of any dam structure in the Emigrant Wilderness.  To prevail, the moving party must show either: "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor." Walczak v. EPL Prolong, Inc., 198 F.3d 725, 731 (9th Cir.1999); Oakland Tribune, Inc. v. Chronicle Publishing Company, Inc., 762 F.2d 1374, 1376 (9th Cir. 1985).  The two formulations represent two points on a sliding scale with the focal point being the degree of irreparable injury shown. Walczak, 198 F.3d at 731; Oakland Tribune, 762 F.2d at 1376.  The greater the relative hardship to [the moving party], the less probability of success must be shown. Walczak, 198 F.3d at 731.  "Under either formulation of the test, plaintiff must demonstrate that there exists a significant threat of irreparable injury." Oakland Tribune, 762 F.2d at 1376.  In the absence of a significant showing of irreparability, the court need not reach the issue of likelihood of success on the merits. Id.

Defendants correctly contend that Plaintiffs, if successful on either or both of their claims, are not entitled to injunctive relief.  This is due to the lack of any possible immediate irreparable harm.  The grant of Plaintiff's motion for summary judgment under the Wilderness Act merely means nothing happens.  Forest Service, lacking legal authority to proceed with the maintenance or repair of the dams is automatically foreclosed from doing either.  Further, the court's ruling

setting aside the ROD means simply that the dams will continue to be not operated as has been the case for the past several years.  Invalidation of the ROD will, by its nature, continue the status quo making the grant of injunction unnecessary.

Defendants cross-motion for summary judgment will correspondingly be granted as to Plaintiffs' claim under NEPA and denied as to Plaintiffs' claim under the Wilderness Act.

## ORDERS

THEREFORE, in consideration of the foregoing discussion, it is hereby ORDERED that:

1.   Plaintiffs' motion for summary judgment on their claim for relief pursuant to 5 U.S.C., section 706(2) to declare Forest Service's decision as reflected in the Report of Decision to repair, maintain and operate the several dam structures in the Emigrant Wilderness unlawful and to set aside same is hereby GRANTED.  Defendant's motion for summary judgment on the same issue is correspondingly DENIED.

2.   Plaintiffs' motion for summary judgment on their claim for relief pursuant to 5 U.S.C., section 706(1) to declare unlawful Forest Service's decision to not consider or adopt actions that would cause the several dam structures in the Emigrant Wilderness to be physically removed, and to compel Forest Service consider and/or adopt same is hereby DENIED.  Defendant's motion for summary judgment on the same issue is correspondingly GRANTED.

3.   Plaintiffs' request for injunctive relief is hereby DENIED.

4.   That portion of Forest Service's Report of Decision that authorizes the repair, maintenance and operation of the several dam structures in the Emigrant Wilderness is hereby SET ASIDE pursuant to 5 U.S.C., section 706(2).  Forest Service may take further action consistent with this memorandum opinion and order.

IT IS SO ORDERED.

Dated:    **June 8, 2006**                          **/s/ Anthony W. Ishii**
0m8i78                                    UNITED STATES DISTRICT JUDGE